**FILED**
JAMES J. WALDRON, CLERK
January 31, 2013
U.S BANKRUPTCY COURT
NEWARK, NJ

By: ___Margaret Cohen___
Deputy

FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re | Case No.:     09-32883 (MS) |
| JACK H. BOYAJIAN, | Chapter 7 |
| Debtor. | |
| CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE, | Adv. Pro. No.:  10-1065 (MS) |
| Plaintiff, | |
| v. | |
| JACK H. BOYAJIAN, | |
| Defendant. | |

## **O P I N I O N**

**APPEARANCES**

McCARTER & ENGLISH LLP
Charles A. Stanziale, Jr., Esq.
Kate Roggio Buck, Esq.
Donald J. Crecca, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102
*Counsel for Plaintiff,*
*Charles A. Stanziale, Chapter 7 Trustee*

WILLIAM RUSH, ESQ.
585 Hoboken Road
Carlstadt, NJ  07072
*Counsel for Defendant, Jack H. Boyajian.*

**HONORABLE MORRIS STERN, Bankruptcy Judge**

## I.    INTRODUCTION

Debtor-defendant Boyajian filed a Chapter 7 bankruptcy petition on August 31, 2009.

The duly appointed trustee filed the immediate adversary proceeding on January 19, 2010.[1]  The

trustee seeks denial of a bankruptcy discharge for debtor, based upon 11 U.S.C. § 727 (a)(2)

through (a)(5).[2]  Cross-motions for summary judgment are before the court at this time.

Boyajian, well educated in finance and law, has been an active and apparently

sophisticated businessman.  He operated in part in the real estate marketplace as a broker,

developer and "converter" of cooperative apartments to condominiums, and in part as a

nationwide debt collector, first commercially and then through his law practices.  The debtor

attributes his bankruptcy to overextension in real estate development and the market's crash.

Indeed, all of the development projects appear to have been foreclosed or turned over to lenders

through deeds in lieu of foreclosure.  Whatever the cause, Boyajian has scheduled an enormous

amount of debt (disputed or otherwise), bulking up to $39,640,342.[3]  Yet his estate will have *no

assets* to distribute to creditors.

Boyajian had been pursued for years by the Internal Revenue Service for a tax

delinquency arising out of a defunct business, and by various state agencies and by at least two

individuals for his debt collection practices.  Avoidance of asset ownership has been an

---

[1] The Trustee took two depositions of Boyajian, a December 18, 2009 examination pursuant to Fed. R. Bankr. P. 2004 (hereinafter "T1") and a July 30, 2012 deposition pursuant to Fed. R. Bankr. P. 7030 (hereinafter "T2").

[2] Section 727(a)(2) (destruction of property); § 727(a)(3) (failure to keep records); § 727(a)(4) (false oath or account); § 727(a)(5) (failure to explain loss of assets).

[3] On schedules filed September 14, 2009 and amended September 17 and October 23, 2009 the debtor listed:  no real property; $50,980 in personalty (of which $40,000 is an account receivable due one of debtor's defunct law firms and the balance is claimed exempt); $35,000,000 in secured debt for which the collateral is not identified; $850,000 in priority debt due IRS; and $3,799,709 in general unsecured debt.

embedded long-term practice of this debtor, who has been a controversial professional as well as an admittedly freewheeling entrepreneur.

Notwithstanding the high degree of complexity of the Boyajian business affairs over a protracted period, he (i) has not maintained a personal bank account for the period 2004 to May 2012, (ii) had not filed personal income tax returns for the period 2006 through 2008 prepetition until those returns were prepared and filed in or around December 2011(well into his pending bankruptcy case), (iii) has operated much of his highly complex business activities through family trusts which he controls as trustee but disclaims grantor or beneficiary status, (iv) had been delinquent prepetition in filing tax returns for the period 2006 through 2008 for the most active family trust, until those returns were prepared and filed in or around December 2011, and (v) generally has been in control of a high volume of business and financial affairs where "[t]he condition of the books and records of [Boyajian, family members, the most active family trust, his law firms and other affiliates] was generally very poor and in some cases completely indistinguishable or virtually worthless." [4]  The debtor himself concurs that the books and records had been "in shambles."[5]

Boyajian argues that *now,* years into his bankruptcy case and after much initial delay and then twenty-one months of his accountant's work, he has provided the trustee with compliant recorded information.  The documentation includes more than ninety tax returns (apparently all created post-petition), part of an electronic file of 24,000 or so pages most of which was produced in April 2012 when the debtor was faced with a discovery motion.  Without conceding their adequacy, the trustee in part through these documents has sought to portray Boyajian's

---

[4] This statement is from the affidavit of Robert J. Weir, CPA, *offered by Boyajian* (adv. dkt.  41-4, ¶ 4) (hereinafter "Weir Aff. I ___").   Mr. Weir added "[i]t took more than 21 months, from November 2010 to July 2012 to review, reconstruct, confirm, correct and verify the books and records . . . before we were able to prepare the tax returns for the relevant periods."  *Id.* at ¶ 5.

[5] Boyajian's affidavit in response to plaintiff's motion (hereinafter "D. Aff. ___") at ¶ 21.

financial condition very differently than what the debtor has alleged.[6]  The trustee's portrayal is

based upon reconstructed and estimated numbers; the accuracy and bases for these numbers are

substantially challenged by the debtor.  Overall, the debtor protests that the trustee should have

requested (by motion or through more in-depth discovery) documentation or testimony necessary

to complete the trustee's duty of inquiry.  However, in the final analysis this court concludes that

Boyajian has, without justification, failed to keep or preserve adequate recorded information

required by the Bankruptcy Code so as to garner a discharge in bankruptcy.  Most significantly,

in the circumstances of this case the debtor's effort to cure his recordkeeping failure by

submitting *years post-petition* financial information, including a raft of tax returns, will not be

permitted. Discharge will thus be denied this debtor.

## II.     JURISDICTION

This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334(b) and this

District's Standing Orders of Reference of July 23, 1984 and September 18, 2012.  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A), (J) and (O).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court, viewing the facts in the light most

favorable to the nonmoving party, finds that there is no genuine issue of material fact, and the

---

[6] The trustee, *inter alia*, disputes the veracity of Boyajian's bankruptcy petition.  He claims that loss of
assets is not explained by the debtor, that sources of income or funding are concealed, and that Boyajian's
statement of expenses, and other sworn petition statements, are inaccurate.

moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); Fed. R. Bankr. P. 7056, Fed. R. Civ. P. 56(a).  At summary judgment "the judge's

function is not to weigh the evidence and determine the truth of the matter, but to determine

whether there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632,

637 (3d Cir. 1993).  Use of summary judgment in bankruptcy adversary proceedings is an

efficient means to preserve limited estate assets.  It "is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex

Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).  *See also In re Strbac*, 235 B.R. 880, 884-85

(B.A.P. 6th Cir. 1999) (denying discharge under 11 U.S.C. § 727(a)(3) on summary judgment

where the court determined that the debtor's records were inadequate to determine his financial

affairs and the debtor had provided no justification for the condition of the records).  *In re

Jacobowitz*, 296 B.R. 666, 668, 672-73 (Bankr. S.D.N.Y. 2003), *aff'd*, 309 B.R. 429 (S.D.N.Y.

2004) (denying discharge under 11 U.S.C. § 727(a)(3) on summary judgment to sophisticated

insurance broker who could not document business and other expenses on which he based his tax

returns and Schedule J).

## IV.    SCOPE OF RECORDED INFORMATION REQUIREMENT OF 11 U.S.C.
§ 727(a)(3)

As a general matter, resolution of issues in controversy in the context of § 727 objections

to discharge is to be weighted in favor of the debtor.[7]  Denial of discharge is a serious matter

going to the heart of individual bankruptcy.  Nevertheless, § 727 (and particularly its (a)(3) part)

protects interests "of creditors and . . . the [debtor] is required to take such steps as ordinary fair

dealing and common caution dictate to enable the creditors to learn what he did with his estate."

---

[7]*See Devers v. Bank of Sheridan* (*In re Devers*), 759 F.2d 751 (9th Cir. 1985); *Bank of Pa. v. Adlman* (*In re Adlman*), 541 F.2d 999 (2d Cir. 1976); *see generally* Fed. R. Bankr. P. 4005.

*Koufman v. Sheinwald*, 83 F.2d 977, 980 (1st Cir. 1936); *see also United States v. Trogdon* (*In re*

*Trogdon*), 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990).  The text of § 727(a)(3) provides for

denial of the § 727 discharge where:

> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtors' financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

A leading bankruptcy treatise, 6  COLLIER ON BANKRUPTCY ¶ 727.03[3][a] (Alan N.

Resnick & Henry J. Sommer eds., 16th ed.) ("*Collier*"), describes the manner of keeping books

for § 727(a)(3) purposes as follows:

> The debtor's obligation to present records of financial information is intended to protect the trustee and creditors by enabling them to determine or confirm the debtor's financial condition and the cause of the debtor's financial difficulty.  The records need not be in any particular form; however, they must be sufficient to "enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past."

*Id*. at ¶ 727.03[3][a], pp.727-29 (footnotes omitted).

In the Third Circuit, *Meridian Bank v. Alten*, 958 F.2d 1226 (3d Cir. 1992) has long been

the principal precedential touchstone for analysis of § 727(a)(3) objections.  "[I]n order to state a

prima facie case under section 727(a)(3), a creditor objecting to the discharge must show (1) that

the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it

impossible to ascertain the debtor's financial condition and material business transactions."  *Id.*

at 1232 (citation omitted).  Indeed, the ultimate burden of persuasion resides with the party

objecting to discharge.  However, once an initial showing is made that a debtor's records are

inadequate, the burden of going forward to establish *justification* for inadequate recordkeeping rests with the debtor.  *Id.* at 1232-34.

The principal import of the *Meridian Bank* opinion is its standard for determining whether failure to keep records is *justified*.  The *manner of keeping books and records* was not at issue in the case (the debtors had conceded that no books and records were kept).  Determination of justification for inadequate documentation would include consideration of the following:  (1) debtor's education; (2) debtor's sophistication; (3) volume of debtor's business; (4) complexity of debtor's business; (5) amount of credit extended to debtor in his business; (6) any other circumstances that should be noted in the interest of justice.  *Id*. at 1231.  Intended concealment of a debtor's financial condition by failure to maintain appropriate records need not be established to deny discharge per § 727(a)(3) (*id.* at 1234) (mere failure to maintain recorded information being sufficient).

The *manner* of keeping sufficient books and records is, in terms of § 727(a)(3) statutory structure, distinct from *justification* (or lack of it) for documentary inadequacy.  Yet, the *Collier* treatise (citing *Meridian Bank* among other cases) not unexpectedly relates recordkeeping requirements to factors which are likewise often considerations when justification is at issue, such as: the nature of a debtor's business (or lack of a business, as with consumers); the business sophistication of the debtor; and, the nature and extent of the debtor's transactions.  *See, generally, Collier* ¶ 727.03[3].  And there is the ultimate functional analysis of adequacy of books and records: do they in fact disclose both the debtor's financial condition and material business transactions?  *Id*. at ¶ 727.03[3][f].

**V.    WHETHER DEBTOR HAS KEPT RECORDS ADEQUATE TO DETERMINE HIS FINANCIAL CONDITION AND BUSINESS TRANSACTIONS**

**A.    Boyajian's educational and business background.**

Boyajian, born December 1, 1959, is well educated.  He holds a Bachelor of Science degree in Finance and Decision Sciences from the University of Pennsylvania, Wharton School of Finance (1982), and a law degree from Rutgers Law School (1996).[8]

In response to the "Statement of Financial Affairs" included in Boyajian's bankruptcy petition (at inquiry no. 18 as to business interests), the debtor included a comprehensive twenty-two line item compendium of entities owned, operated and/or overseen by him.  This list includes two law firms owned 100% by him (and through which he engaged in debt collection nationwide), an array of real estate operating and development entities, and real estate brokerage and allied real estate investment/consultancy entities.  Hence, Boyajian has had a long,[9] broad-spectrum business history.  He can readily be characterized as a sophisticated and experienced businessman, notwithstanding his ultimate financial failure.

**B.    Debtor's History of Litigation and Regulatory Disputes.**

1.    *Tax Liability.*

The debtor was sued by the United States based upon federal tax liability.  *See*

---

[8]These facts are from "Plaintiff's Statement of Undisputed Facts" (hereinafter "UF    ___"), uncontested by the defendant unless indicated otherwise.  *See* UF  11 and  14.

[9]  The inquiry no. 18 response includes "The Hutton Group, Inc.," a New Jersey "C" corporation apparently organized in 1992 and still active as of the petition date; not listed is "Far Hills Management," the source of the debtor's long-running tax dispute with IRS, apparently operated under Boyajian's control at the time of the 1989 tax liability accrual.

"Complaint for Federal Taxes," Ex. P to plaintiff's motion.  The complaint, in part seeking

recourse to the house in which Boyajian resides (the "Saddle River residence") on the theory of

fraudulent conveyance, recites the following:

> 17.    On December 4, 2006, this Court held, in the case of *Jack H.
> Boyajian v. United States,* 2:04-cv-04835-KSH, that [Boyajian] was indebted to
> the United States in the amount of $666,219, plus interest accruing from January
> 10, 2005 . . . until paid.
>
> 18.    The judgment related to payroll taxes that Mr. Boyajian was
> responsible for withholding from employees salaries and paying over to the
> United States from the second quarter of 1989 through the second quarter of 1992.
>
> 19.  On October 31, 2007, an abstract of judgment was filed in Bergen
> County Clerk [sic], Book 325, Page 172.
>
> 20.    The United States recorded a notice of federal tax lien on January
> 14, 1994 against Mr. Boyajian for the liabilities referred to in paragraph 18.
>
> 21.    Mr. Boyajian filed a request for an offer in compromise on August
> 8, 1996, which the Internal Revenue Service rejected on August 22, 2000.

That case, grounded in the payroll tax claim due from early 1989, was settled by Stipulation

dated October 25, 2012.  *See* Ex. Q to plaintiff's motion.  *Inter alia*, it was agreed that the United

States' judgment and federal tax lien (in the amount of $666,219 plus interest from January 10,

2005) would attach (on a substantially subordinated basis) to the Saddle River residence.

　　2.  *Controversy with bar admissions.*

The debtor had passed bar examinations in New Jersey, New York, California and

Florida.  *See* UF 15.  However, he is not presently a member of the bar of any state.  The

debtor in *Defendant's Response to Plaintiff's Statement of Undisputed Facts and*

*Defendant's Own Statement of Undisputed Facts* (adv. dkt. 4) ("DR __") disputes the

trustee's negative characterization of the circumstances regarding Boyajian's bar

applications.  The debtor's more favorable responding view is as follows:

> *New Jersey.*  Debtor withdrew his application for admission before the "moral
> review committee" recommended denying him admission because of complaints

against "G&L Financial Services" (for debt collection, T1 20:12-14) and because of the issue of unpaid payroll taxes for "Far Hills Community Management" (UF 16; DR 16).

*New York.*   Again, the relevant bar committee denied him admission because of complaints against G&L Financial Services and because of the issue of unpaid payroll taxes at Far Hills Community Management (UF 16; DR 16).

*Florida.*   The debtor was never admitted to practice in Florida, based upon an unacceptable delay in application following his passing the professional responsibility exam (UF 20; DR 20).

*California.*   The debtor was conditionally admitted in 1997 and admitted in 1999. Boyajian was subject to a disciplinary complaint in May 2008 based on the debtor's collection activities (UF 17-19; DR 17-19).   He tendered his resignation from the California bar in 2009 after defending the California bar action for more than eighteen months, claiming lack of funds needed to continue his defense through trial (DR 19).[10]

3.      *Consumer and Related Regulatory Actions.*

Boyajian engaged in nationwide debt collection through his law practices (as well as earlier through other business entities).  He testified that he operated in at least thirty states.

These debt collection activities resulted in claims against him in no fewer than four states (as follows):

*Arkansas.*   On December 18, 2007 the State of Arkansas, through its attorney general, filed a complaint in Arkansas state court against the debtor and two law firms which he owned or controlled for violations of the Arkansas Deceptive Trade Practices Act ("ADTPA").   Since bankruptcy interdicted the Arkansas case, the attorney general filed an adversary proceeding here to except the claim from discharge per 11 U.S.C. § 523(a)(2) and (a)(7).   (Bankr. Adv. Pro. 09-2767.)   An October 19, 2009 order of this court (over the debtor's objection) acknowledged that the state action could continue.   It resulted in a "Final Order" which imposed

---

[10] The debtor's bar history evidences the degree to which the longstanding payroll tax claim of IRS and Boyajian's debt collection activities haunted him.   The decade of bar admission problems outlined above thus served continuously to emphasize to the debtor his financial jeopardy and to presage the entry of judgments against him.   In such jeopardy, Boyajian operated in significant part through what became the relatively opaque and shielding medium of the Boyajian Asset Trust, and chose not to maintain a personal bank account or take assets into his own name.   Moreover, locked out of bars (but for California) where he passed exams, and then facing a disciplinary action in California (resulting in resignation after eighteen months of proceedings), it was clear to Boyajian that law firm income was at risk (and, eventually, became unattainable).

a $194,000 civil penalty against the debtor for 776 violations of the ADTPA. On September 12, 2011 this court granted the State of Arkansas summary judgment (unopposed by the debtor) excepting the $194,000 penalty from discharge (Adv. Pro. 09-2767, dkt. 15).

*Colorado*. A March 8, 2010 consent decree, Exhibit D to plaintiff's motion, details this state's action against Boyajian. On July 8, 2008 the State of Colorado, through its attorney general, filed a complaint in Colorado state court against the debtor, entities found to be controlled by the debtor, and others, for violations of the Colorado Fair Debt Collection Practices Act (the "Act") and the Colorado Consumer Protection Act ("CPA"). The state court consent decree resolving the action (1) enjoined the defendants from pursuing debt collection in Colorado; and (2) entered judgment of $200,000 jointly and severally against the defendants, suspending collection of $180,000 against the debtor so long as he paid a settlement amount of $20,000 on a schedule provided therein. The debtor does not dispute that he never sought bankruptcy court approval of this *post-petition* settlement (UF 5-9); rather, he avers that his attorneys made a mistake. D. Aff. ¶ 47. By letter of March 26, 2010 the attorney general of Colorado stated that he would not seek collection against the debtor so long as the bankruptcy stay remained in effect. D. Aff. Ex. H.[11]

*New York*. Under cover of a March 12, 2010 letter, New York attorney Brian L. Bromberg, Esq. on behalf of his client Kimberly Larsen provided to the Chapter 7 trustee a copy of the Colorado consent decree (Ex. D to plaintiff's motion). Mr. Bromberg stated that he "represents a judgment creditor against [debtor] on an FDCPA [Fair Debt Collection Practices Act] case that was pending in the Eastern District of New York. *See Larsen v. JBC Legal Group, P.C.,* EDNY Case No. 04-CV-4409 (ETB)." Boyajian scheduled this debt in his petition in the amount of $55,000, and as "undisputed."

*Montana*. Brad Alexander obtained a $90,000 default judgment against the debtor and the law firm JCB Legal Group as a result of debt collection practices. UF 23 and 24; DR 24. Boyajian does not dispute that he filed his bankruptcy petition on an emergent basis to interdict a scheduled deposition in the Alexander matter. UF 23.

**C.    The Assetless Businessman.**

1.    *Total absence of nonexempt assets.*

Notwithstanding decades of business activities, Boyajian's bankruptcy petition reflects no

nonexempt assets (and only a modicum of exempt assets). Moreover, this state of financial

---

[11]A March 16, 2010 e-mail from L. Donald Huelson, Esq., the debtor's Colorado counsel, to the Colorado attorney general alludes to a *Minnesota* settlement. D. Aff. Ex. G in response to motion. No further information is available to the court.

affairs is apparently not the result of particularly successful creditor collections nor is it a circumstance which developed on the eve of bankruptcy.  The debtor has had a history and practice of rendering himself essentially judgment proof well before the crashing real estate market.  This "insulation" from creditor action appears to have been prompted by the IRS claim (dating back at least to the 1990s) as well as by Boyajian's high-risk business practices.  It is obvious that Boyajian took calculated and extraordinary steps to prepare himself for "judgment day."  Those steps neglected to include maintaining adequate books and records of account.

2.    *The Boyajian Asset Trust*.

At the center of Boyajian's judgment-proofing *modus operandi* is the "Boyajian Asset Trust," nominally settled by his mother, Araxie, on July 1, 2004.  Boyajian has always served as its sole trustee.  *See* Trust Agreement, T1-Ex. 13.  The Trust Agreement at ¶ 2 references a transfer of property "enumerated in Schedule A, annexed hereto."  That schedule recites "One Hundred Dollars ($100.00)."  Nevertheless, the corpus of the trust is said to be made up of entities identified by Boyajian at the December 2009 and July 2012 depositions.  It appears that as of the petition date only trust entities "ROA Hutton, LLC" and "Equity One, LLC" remained active.[12]  Overall, the trust was described by Boyajian as follows:

> Boyajian Asset Trust is essentially the equivalent of a holding company that has several business opportunities that it is involved in.  It has a hundred percent of a business that converts property [ROA Hutton, LLC].  It has now no interest in real estate development, but it did own at one time 80 or 90 percent of Shoreside I, Shoreside II, Shoreside III, it owned 75 percent of Highland 100, that's now gone out and has lost all its property.
>
> It had a percentage of P.C. Stockton in Stockton, California [another in the series of real estate developments] which has also been fully foreclosed on.  (T2 228:7-21.)

---

[12] An earlier family trust settled by the debtor's father in 1991 (now with virtually no assets) is said to have included these two entities, which were "moved over to the Boyajian Asset Trust when it was created."  T2-189:12-14; *inter alia,* see T2-188:17-190:2.

In addition to the above-referenced entities, the Saddle River residence has been

"accounted for" as a trust asset, though a deed from record owners Araxie and Boyajian's sister

Helen to the trust was executed but never recorded.  *See* UF 41-44 and Ex. M to plaintiff's

motion.

Boyajian has been the trust's business and productive force, as well as the absolute

controlling party in guiding and manipulating this umbrella entity.  The terms of the trust assure

the debtor's relatively unbridled authority.  It identifies the beneficiaries of income and principal

as "Grantor's issue other than Jack H. Boyajian (but including the issue of [the debtor])."

T1-Ex. 13 ¶ 3.  However, as trustee Boyajian can exclude one or more beneficiaries, and

generally favor by unequal or disproportionate distribution his children over others.[13]  *Ibid.*

Moreover, the purported "Grantor" (Araxie) need not be the sole source for settling the trust:

"[t]he Trustees [yet there is only one, the debtor] may accept money or property as additional

contributions to the Trust from the Grantor *or anyone else at any time*."  T1-Ex. 13 ¶ 2 (emphasis

added).   As to his mother, Araxie, no specific trust benefit inures to her.  Moreover, she has

provided her son (the trustee) with a power of attorney over her affairs.[14]  Ultimate trust

distribution upon termination is to the issue of Boyajian (at this time he has four children).  *Id.* at

¶ 4.  Boyajian retains the power to terminate the trust.  *Ibid.*  Overall, the generally cryptic Trust

Agreement includes an expansive list of trustee powers.  *Id*. at ¶ 5.

---

[13] In fact, the trust pays part of the education costs of each of the debtor's two college-age children.
D. Aff. at ¶ 12.  And, as will be detailed below, the expenses of the luxury residence housing the debtor,
his wife and four children, have been borne by the trust.

[14] *See* T-2 Ex. 20, a broadly stated general power of attorney dated February 4, 2005.  Among other
powers, Araxie granted her son Jack powers to conduct banking transactions as set forth in N.J.S.A.
46:2B-11, as well as comprehensive authority to deal with her business entities and the conduct of her
business.

In sum, the debtor has controlled the holding company-trust, and, as "President," all held entities. *See* plaintiff's Exhibit A to motion (bankruptcy petition at "Statement of Financial Affairs" response 18). In addition he has had the means to control his mother's finances and business affairs.

The trust's 2006-2010 U.S. tax returns were filed on or after December 11, 2011. *See* plaintiff's Ex. N to motion. Of course, it was Boyajian's obligation as a fiduciary to have returns filed on a *timely* basis and as required by law. In any event, the very late filed 2006 return reflects "Total income" (line 9) of $465,622. "Tax due" (line 27), was calculated as $123,607. Underlying these numbers was, among other elements, $1,514,149 of "Gross income" from ROA Hutton, LLC (Schedule C, line 7). The comparable numbers in the 2007 return were $39,191 (Total income), $4,080 (Tax due), and ROA Hutton's "Gross income" of $1,503,486. Returns for 2008 through 2010 reflect no positive "Total income" or any "Tax due," but ROA Hutton nevertheless generated "Gross income" of $1,117,102, $1,271,931 and $1,046,811, respectively. In short, this debtor was apparently quite active in his business ventures even as the real estate development projects imploded. Large sums of money for which he had an accounting obligation were under his control (including $4,134,000 of gross income from ROA Hutton alone for the years 2006-2008, and $2,319,000 for 2009-2010).[15]

---

[15] On his late filed (after September 9, 2011) individual U.S. tax return for 2009, the debtor reported income from ROA Hutton, LLC of $51,760 and $10,577 from "corporations compensation," all apparently through trust-owned entities; he also reported $70,636 from his law firms which were about to be closed due to Boyajian's 2009 California bar resignation. The debtor's wife's 2009 return shows $85,577 as wages from ROA Hutton, LLC. *See, inter alia*, plaintiff's Exs. J and K to motion. Expenses relating to the Saddle River residence were paid by the trust. Boyajian, through law firms he owned as well as by virtue of being trustee of the trust and President of ROA Hutton, LLC, controlled substantial income and expenditures right up to the petition date when he attested to his assetless and hopelessly insolvent financial condition.

3.    *The Saddle River Residence.*

Boyajian, real estate developer-broker-manager-investment adviser, does not hold title to

a residence; nor does his spouse.  Yet, he and his family (wife and four children) reside in a

seven or eight bedroom luxury home.[16]  Moreover, though claiming to be obligated by oral

arrangement to a $2,500 monthly rental, the debtor has not paid rent since October 2007.  The

Boyajian Asset Trust had paid the housing expenses, though the last mortgage payment including

escrow for taxes and insurance was made in 2010.  *See, generally*, UF 36-38; DR 36-38.

The residence was purchased by the debtor's mother, Araxie, and sister, Helen, on July

31, 2004 for $4.25 million.  Araxie and Helen apparently live in the house with the debtor and

his immediate family.  Araxie and Helen applied for and were granted a mortgage loan to partly

fund the purchase; Boyajian's law firm lent them $1,036,794, a "bridge loan," to complete the

funding.  The bridge loan was said to have been repaid on April 11, 2005.  *See* DR 70e and 70f;

and Ex. P ¶ 22 to plaintiff's motion.

By deed dated November 11, 2004 Araxie and Helen executed a grant of title to the

residence to the Boyajian Asset Trust.  The deed was never recorded, though the trust undertook

all financial obligations associated with ownership.  UF 43 and 44.  Whether the mortgage lender

would have consented to this transfer if requested (written consent to transfer being required per

the mortgage terms), is unknown.  *See* UF 45.  In any event, the means was available to Boyajian

as trustee to record the deed as he saw fit, thereby controlling the asset, while providing for its

upkeep through the trust (which in turn was generating income through Boyajian's business

efforts).  And, of course, the bridge loan money remained with him through his law firm.  The

---

[16] The debtor has provided two late 2011 appraisals of the residence which vary slightly as to description and value.  Both concur that the house is a 10,000 square-foot residence which is sited on two acres, has an in-ground pool, four fire places, and a four-car garage.  D. Aff. Exs. A and B.  The appraisals advise respectively that 2009 real estate taxes were $27,583.61 and those for 2011 were $28,760.59.  The appraisal values range from $2,750,000 to $2,866,000.

debtor's mother and sister, one or the other seemingly being the source of the equity financing of the house, gave up title but resided in the house apparently without financial obligation.

By controlling the $4.25 million residence in the second half of 2004, Boyajian could benefit from its appreciation in a then-booming market – while shielding that gain from his creditors. Several years later the market devalued the house, rendering it "under water."

Substantial funding was required to support the residence. The trustee and the debtor disagree about such expenditures (and sources of funding). The expenses over a five-year period were at least a half-million dollars and perhaps twice that amount. *See* Supp. Aff. of A.R. Green, adv. pro. 42 ¶¶ 9-16; UF 58 and 59; DR. 59.

As indicated above, the IRS litigation in the district court is now settled. *See* plaintiff's Ex. Q to motion (dated October 26, 2012). D. Aff. ¶ 36 relates the following:

> The NJ Tax Case was settled before trial by stipulation and the case has been dismissed . . . . The Settlement includes an agreement to have the judgment against me as to unpaid payroll taxes from 1989 to 1992 attach to the Saddle River Residence, subordinate to existing mortgages that currently total over $4.6 million, a resolution which depends for its completion on the approval of the beneficiaries of the Boyajian Asset Trust ("Trust"), which holds title to the property. *Neither I nor any of the other defendants have made any admission as to the claims or allegation relating to the case. I continue to contest any related or similar allegations by the Plaintiff in the case before this honorable Court.* I have personally discussed and obtained the verbal consent as to the terms of the settlement with the majority of the beneficiaries of the Trust (currently the unrecorded owner of the property). *My intention is to obtain the written consent of and ratification by all the beneficiaries of the Trust or their representatives as to the Settlement in the next few weeks.* [Emphasis added.]

Thus, no fraudulent conveyance of the residence was admitted; yet beneficiaries have acquiesced or are being solicited by the debtor to acquiesce to the government's lien. Of course, the lien appears to be worthless at this time.

In sum, the circumstances surrounding the acquiring, transfer, and support for the

Boyajian family's luxury Saddle River residence raise "red flags" which require trustee inquiry

and availability of "recorded information" to aid that inquiry.  The residence-related transactions

were plainly more complex than the ordinary house purchase, involved a high dollar value asset,

and included an intra-family enabling loan.  And, at the center of the machinations was the

debtor—as a "bridge" lender through his law firm, as trustee of the ostensible ultimate owning

trust, and undeniably as the family member "in charge."

### D.    Debtor Has Failed to Keep Records or Preserve Adequate Records.

1.    *Boyajian's CPA's assessment of books and records.*

Robert J. Weir, CPA, offered a frank and extremely negative view of books and records

maintained by his client, the debtor, and on behalf of the debtor's spouse, mother and sister, his

law firms, the Boyajian Asset Trust, and other affiliated entities.  "The condition of the books

and records . . . *was generally very poor and in some cases completely indistinguishable or*

*virtually worthless."*  Weir Aff. I ¶ 4 (emphasis added).  The required in-depth accounting

services were not begun until some fourteen months into this bankruptcy case.  *Then* the

accountant through his office worked from November 2010 to July 2012 (more than twenty-one

post-petition months) to prepare tax returns.  *Id*. at ¶ 5.  Some returns previously filed were

"incorrect" and necessitated preparation of amended returns.  *Id.* at ¶ 6.

After the trustee pounced on the Weir assessment as a clear acknowledgement of

Boyajian's recordkeeping failure, a Supplemental Affidavit of Weir was filed in an effort to

"explain" the originally stated assessment.  *See* Weir Supplementary Affidavit, dkt. 46-1

(hereinafter "Weir Aff. II").  However, that explanation only serves to emphasize what this court

(not the trustee) garnered from the plain language of the CPA's assessment of *prepetition* books

17

and records.[17]  Nowhere does the accountant recant his earlier unequivocal negative statements

as quoted immediately above.  Moreover, the accountant, acknowledges the facts that (i)

corrective work by his office took hundreds of hours of service, (ii) financial information

provided by Weir post-petition is unaudited, and (iii) the provided information was either based

on or otherwise included input from Boyajian, input which was said to have not been simply

accepted by the accountant.[18]

    The accountant does not comment on nor make any statement that would disagree with

his client's assessment that on the petition date relevant books and records were "in shambles."

---

[17] Mr. Weir states the following (Weir Aff. II ¶¶ 5 and 8):

> 5.    While *it is true that I did say the books and records of all the Entities were in poor shape* and required review, confirmation or corrections, the fact is that the resulting product, including the tax returns that were prepared and filed, are all consistent with the corrected and confirmed books and records of the Entities.  [Emphasis added.]

> 8.    I also note that the Trustee's reply mischaracterize a comment that I made in my Original Affidavit where I stated that in "*some cases*", [emphasis in original] the books and records were "completely indistinguishable or virtually worthless".  My comment certainly did not refer to all of the Entities nor all years that we reviewed, but rather was meant to relay the amount of work we needed to do for "some" entities and for "some" years *which would explain the amount of time and effort my office had to expend*.  [Emphasis added.]

[18] Weir Aff. II ¶ 9 is as follows:

> 9.    The Trustee's suggestion that the financial information he received *after* my office completed our review and prepared the tax returns remained "virtually worthless" is simply incorrect.  My office spent hundreds of hours of work to correct the information so that we could prepare accurate financial information and tax returns.  *While I agree that the information is unaudited we did not simply accept the information supplied by Jack Boyajian*.  [Emphasis added.]

    2.    *Immediate case context and status of books and records on the petition date.*

When the debtor filed his bankruptcy petition on August 31, 2009, he had failed to maintain a personal bank account for about five years and was years behind in filing tax returns for himself and the trust for which he was trustee. Other related tax returns were likewise substantially delinquent. And, in terms of petition date case context the trustee was presented with a network of more than a score of Boyajian-related business entities which had borrowed more than $35 million and had essentially no assets. Yet the debtor and his family were living in an expensive home, expenditure free and years behind in paying a relatively modest rent.

Bank accounts and tax returns – missing on the petition date in this case – are the ordinary course documentary starting points for trustee investigation of Chapter 7 debtor finances. Here, it took *over two years* into this bankruptcy case just to get tax returns prepared. Moreover, the debtor's accountant candidly notes the flawed records upon which the belated returns were based.

    3.    *Impact of the debtor's recordkeeping failures on the duties of the Chapter 7 trustee and the bankruptcy estate.*

Faced with the complex business activities of a debtor who had (i) a history of keeping assets out of the reach of creditors, and (ii) failed to keep/prepare ordinary course financial records, the trustee undertook his statutory duties. Included (per 11 U.S.C. § 704(a)) in those duties, a trustee shall:

> (1)    collect and reduce to money the property of the estate for which such trustee serves, and close such estate as *expeditiously* as is compatible with the best interests of parties in interest;
> . . . .
> (4)    investigate the financial affairs of the debtor;
> . . . .
> (6)    if advisable, oppose the discharge of the debtor. . . .

[Emphasis added.]

19

Given the Boyajian record deficiencies, it is clear that the trustee could not bring this case to the normal "expeditious" closure. Analysis of the potential for avoidance actions was completely stymied. Yet the question of Boyajian's right to a discharge under § 727 was patently obvious from case outset. Therefore, the trustee was impelled – in what on the face of the petition was a no-asset case – to engage in substantial due diligence. However, the trustee could not possibly fund or otherwise undertake the twenty-one month accounting odyssey which Mr. Weir eventually engaged in for the debtor.

In this position, the trustee (mainly through the work of an in-office highly educated paralegal with business experience) challenged Boyajian's discharge. Indeed, much of the briefing and supporting motion papers in this adversary proceeding debate income and expenditures related to the Saddle River residence, the trust, various business entities, and the Boyajian family. The debtor disputes the trustee's conclusions. Assuming *arguendo* that the trustee's effort at estimating and reconstructing the debtor's financial picture is wanting, *Boyajian* must bear a high degree of responsibility for flaws in the trustee's analysis. The debtor is not entitled to put the trustee at a substantial documentary disadvantage and then, without § 727(a)(3) jeopardy, complain about perceived unreliability of the trustee's conclusion.

More fundamentally, the estate was left without adequate accounting for a high volume of business and other financial transactions. In monetary terms, the debtor, without adequate books and records, controlled and was responsible for receipt and disbursement of extraordinary sums, including (*but not limited to*):

      (i)      $35 million in development project funding (requiring detailed "use of proceeds" tracking even if the projects generated no "income");

      (ii)      Over $4,134,000 in "gross income" taken in by but one controlled entity (ROA Hutton, LLC) in years 2006-2008;

(iii)    Some $1,036,000 said to have been intra-family bridge financing for the Saddle River residence and repaid to a Boyajian law firm on April 11, 2005; and

(iv)    Enough net income from trust sources to fund substantial housing expenditures for the five-year period beginning with the purchase of the Saddle River residence in July 2004,[19] while in addition, compensating the debtor and his wife (principally through ROA Hutton) and paying some college costs of the Boyajian children.

4.    *Debtor's submissions during the pendency of the case and adversary proceeding; the "cure" issue.*

On the August 31, 2009 petition date the debtor's necessary books and records were admittedly "in shambles," "generally very poor and in some cases completely indistinguishable [that is, as between and among records of Boyajian and individuals and entities he controlled] or virtually worthless."  In turn, this admitted failure to maintain and preserve adequate records made it impossible, *at that time,* to ascertain the debtor's financial condition and material business transactions.  *Meridian Bank*, 958 F.2d at 1232.  This fact is the clear import of the required long-term work of the debtor's accountant just to produce delinquent tax returns. Whether years into this no-asset Chapter 7 bankruptcy case such accounting services and documentary discovery would serve to "cure" Boyajian's recordkeeping failure, generates two substantive issues:  (i) should cure be permitted under the facts of this case, and, if so, (ii) are document submissions reconstructed years into the case sufficient to allow the trustee to ascertain the debtor's financial condition and business transactions.[20]

---

[19]    As indicated earlier, this amount is much disputed and debated by the parties.  The housing expenditures appear to have been at least half a million dollars and could well have been twice that amount.

[20]The court has considered process questions.  Does the burden of going forward shift to the debtor to establish his right to cure?  Does that burden shift in determining whether post-petition efforts, in fact,

The few courts that have discussed a post-petition cure for inadequate books and records approach the subject through a weighting of bankruptcy-based equities and as a matter of court discretion. *Hughes v. Lieberman (In re Hughes),* 873 F.2d 262, 264 (11th Cir. 1989), involved a bankruptcy court denial of discharge based upon § 727(a)(3) where the debtor, a professional coin collector, had presented at the trial level "a jumbled mass" of miscellaneous papers. Final judgment denying discharge based upon § 727(a)(3) was entered. A motion for relief from the final judgment per Bankruptcy Rule 9024 (incorporating Fed. R. Civ. P. 60(b)) was denied notwithstanding the debtor's production at the post-judgment stage of cash receipt and disbursement journals which had been in the hands of an accountant. The lower courts viewed the journals as not being "new evidence," and denied the debtor relief. The Court of Appeals chose not to examine the case on the basis of the rules for relief from judgment. *Id.* at 264. Rather, the following was concluded based upon "equitable concerns which permeate the basic objectives underlying the hope of bankruptcy":

> [The debtor] should have a further opportunity to submit adequate, organized financial records to ascertain whether denial of discharge is appropriate. Consequently, we reverse and remand to the district court with instructions that the bankruptcy judge afford Hughes *a specific period of time* in which to present in an orderly way all necessary records, adequately organized and accompanied by appropriate written formal conclusions by an acceptable accountant by which the bankruptcy court can determine the true state of the bankrupt's business affairs. [Emphasis added.]

---

provided adequate books and records? *See Goff v. Russell (In re Goff),* 495 F.2d 199, 201-02 (5th Cir. 1974) ("When additional work on the records is necessitated the statute [the former Bankruptcy Act] provides an appropriate method of analysis," i.e., the debtor's obligation to *justify* record deficiencies). This court concludes that the burden of going forward on these cure issues rests with the debtor.

*Id.* at 263.

*In re Hughes* relied on *Goff v. Russell (In re Goff),* 495 F.2d 199, 202 (5th Cir. 1974).

The issue of cure was raised in *Goff* before the accounting work was undertaken.  *Goff* reached

the following conclusion:

> [C]onsidering all the facts and circumstances disclosed by
> the record, we conclude that it would be appropriate to
> remand the case to the district court in order to permit it to
> consider, in its sound discretion, whether to allow the
> bankrupt, at his own expense, *a reasonable time in which to
> place his books and records in a condition that will
> substantially reflect his financial status*.  [Emphasis added.]

*In re Hughes* presents facts very different from the matter before this court.  There, cash

receipt and disbursement journals not originally presented to the bankruptcy court (*but existing

in the hands of an accountant at the time of the petition filing*), were being offered for review.

*Further delay* in doing accounting work and the inevitable questions raised by *re-creation* of

records in terms of *reliability* were not concerns.  *In re Goff*, again substantially different from

the Boyajian situation, presented the question of allowing post-petition accounting work to bring

into compliance a debtor's retail store business records.  *Feasibility, time involvement,* and *cost*

were concerns of the appellate court.  495 F.2d at 200 n.3 and 201.  Focus was on the threshold

issue of whether cure, not permitted initially, should be reconsidered for allowance by the district

court.  The Court of Appeals was clear on the basic point:  inadequate records as of the petition

date – those which did not "enable interested parties to determine a bankrupt's financial

condition" – did not "fulfill the requirements" of the statute.  *Id.* at 201.  The remand left to the

sound discretion of the district court the issue of allowing post-petition accounting work.

*Hughes* and *Goff* do not support the attempted cure *sub judice*.  In fact, the Boyajian cure effort

is unprecedented.

23

The passage of time – without more – erodes the trustee's potential use of his avoidance and asset recovery powers.  Most generally, those powers are limited in 11 U.S.C. § 546; an action or proceeding under §§ 544, 545, 547, 548 and 552 "may not be commenced" (under the circumstances of this Chapter 7 case) after two years from the petition date.[21]  The August 31, 2009 filing date in this case started the running of the § 546 period of limitation.  It expired on August 31, 2011, well before the debtor produced the electronic file (April 19, 2012) which he claims began to cure his recordkeeping failures.  And, that mass production of nearly 24,000 pages could only have been analyzed thereafter by the trustee over a reasonable period of time in order to determine whether avoidance actions were warranted.

Boyajian does not qualify for any enhanced benefit of equity nor the discretionary relief a bankruptcy court might allow.  Therefore, the debtor will not be granted the privilege of curing his statutory failure.  This conclusion is based on the following:

> • The debtor, highly educated in finance and law, is a sophisticated businessman, experienced in a wide range of commerce and financial transactions; he thus had full capacity to comply with normal course recordkeeping requirements;
>
> • Boyajian engaged in a high volume of financial transactions and operated scores of business entities, in the process controlling the receipt and expenditure of great sums of money, yet he thoroughly failed to account for his dealings;[22]

---

[21] The limitation on actions to recover property of the estate pursuant to § 546 is a statute of limitations, not a jurisdictional bar to suit.  *In re Pugh*, 158 F.3d 530, 534-36 (11th Cir. 1998); *In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1336-38 (5th Cir. 1995).  Extension of this period, though available as with other such periods, is subject to the rigors of case-by-case proofs, and in the immediate case was not sought.

[22] *Compare In re Scott*, 172 F.3d 959 (7th Cir. 1999) (where related debtors had moved funds among personal and business accounts, disregarded corporate formality and lost $20 million in investments) the Seventh Circuit held:

> We have no doubt that the principal concern of § 727(a)(3) is debtors who destroy or hide their records. . . . [W]here debtors are sophisticated in business, and carry on a business involving

• The debtor, driven by the specter of a longstanding federal tax lien, by unrelenting creditor and regulatory actions arising out of his nationwide debt collection activities, and constantly reminded of the negative public view of all of this jeopardy by bar examiners in a number of states, organized his business and personal financial life in a thoroughly defensive manner;

• Boyajian's defensive method of operation was through an umbrella entity, a family trust, which he controlled but which was designed to shelter him from liens and other creditor actions (leaving Boyajian, while appearing to be essentially assetless, living in relative luxury);[23]

• The complexity of Boyajian's operating scheme rendered his financial affairs more difficult to discern – opaque in many ways – and required careful bookkeeping to disclose adequately those affairs (as distinguished from the actuality *sub judice* where there was a complete bookkeeping breakdown);[24]

---

significant assets, creditors have an expectation of greater and better record keeping. . . .  As the debtors in this case lost over $20 million, there might be grounds to question their level of sophistication.  But as they solicited the investments made, set up the impenetrable financial maze and directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that *they should be held to a higher level of scrutiny than an ordinary debtor.*  Where debtors fail to maintain books and records from which their financial history and condition can be ascertained, they must be denied a discharge under 11 U.S.C. § 727(a)(3).  [Emphasis added.]

*Id.* at 970 (internal citation omitted).

[23] "Fear of liens by creditors can never by itself constitute adequate justification for failing to candidly disclose the financial status of a debtor." *Meridian Bank*, 958 F.2d at 1234.

[24] *Compare  In re Von Kiel*, 461 B.R. 323 (Bankr. E.D. Pa. 2012).  The court denied discharge to a physician who for ten years (i) failed to file tax returns for wages by returning his salary to his employer under a vow of poverty and recovering them as gifts; and (ii) failed to account for his gift-income and expenses.  The court emphasized the debtor's "failure to prepare, collect, and preserve records" (*id.* at 336) and concluded:

Debtor, a graduate of medical school and a practicing physician for over twenty years, may be naïve, but he is not wholly unsophisticated.  His financial affairs may be complex, but that complexity is a direct result of his participation with [his employer] and the others in the scheme to evade taxes and his

• Boyajian, well aware (*for years*) prepetition that he was substantially delinquent in filing tax returns, had the wherewithal to straighten out books and records; there is no evidence that the debtor, fully capable of assessing the state of books and records, took any prepetition remedial action;

• The debtor's bookkeeping failure has grossly impaired the ability of the trustee to perform his duties in this Chapter 7 case;

•After the fact of submission, it is plain that monumental and unreasonably protracted accounting efforts (not begun until fourteen months into the case) were necessary even to *attempt* to cure record deficiencies;[25] and

•The debtor resisted and delayed adversary proceeding discovery.[26]

---

creditors. He chose not to prepare, keep, and preserve financial records as part of that scheme, and I will not now reward him for doing so by allowing him to receive the discharge he seeks.

*Id*. at 338. *Cf. In re Martin*, 698 F.2d 883, 888 (7th Cir. 1983) (where a simple transaction was turned "byzantine" by virtue of the debtor's machinations).

[25] Following the August 31, 2009 petition date, it took until November 2010 for the debtor's accountant to begin his services to develop tax returns, etc. Those services were not concluded until July 2012.

[26] After the Trustee served initial adversary proceeding written discovery on September 1, 2011, followed by supplementary requests/demands, and discovery conferences of November 2011 and January 2012, as well as extensions of the discovery deadline from October 1, 2011 to January 7, 2012, February 28, 2012 (and then to March 15, 2012 and finally to August 31, 2012), the Trustee was driven on March 30, 2012 to file and serve a motion to compel responses to interrogatories and document production (the debtor having finally submitted his responses to admissions on January 5, 2012). This motion ultimately generated a response by the debtor on April 19, 2012 (the electronic file of 23,000 pages, including federal and state tax returns for the debtor, his wife, and "all entities and trusts required to file" for the years 2007, 2008 and 2009; production continued into July 2012 (July 20 and 25, in advance of the debtor's long-delayed deposition which was ultimately held on July 30, 2012), and finally to August 30, 2012. UF 10c, 10e, 10-1, 10n; DR 10-1; D. Aff. Ex. E, F, J, K, M, N; *Certification of Donald J. Crecca, Esq., in Support of Motion to Compel Discovery Responses from Defendant* filed March 30, 2012, dkt. 34-2

Indeed, there is nothing in the record of this proceeding to support granting Boyajian an unprecedented opportunity to cure recordkeeping deficiencies.[27]  This conclusion ends the adversary proceeding summarily.  There is no need to reach the question of whether thirty-two months (or more) into the bankruptcy case, submissions by the debtor were substantively "adequate" for § 727(a)(3) purposes.  Nevertheless, the court makes the following observations about those submissions and the debtor's current position on disclosure.

Mere *volume* of document production (the much stressed 24,000 pages here) does not necessarily satisfy the recorded information preservation requirements of § 727(a)(3).[28]  Nor is oral reconstruction of financial history by Boyajian – necessarily a source of the accountant's efforts to prepare tax returns long after business transactions were concluded – an acceptable substitute for contemporaneous and adequately maintained historical books and records or a reliable updated equivalent; hence Boyajian's offer to "paint a picture," without considerably more, is unavailing.[29]  Nevertheless, the debtor would cite the many tax returns prepared post-petition by his accountant as evidencing cure.

---

[27] Overgeneralized notions of "bad faith" or a court's value judgment of a debtor's history not linked to a specific statutory basis for denial of discharge, are not proper determinants of denial of discharge per § 727.  In the immediate case, Boyajian's business and financial history has been considered, but only to the extent the history is linked to his recordkeeping default and would-be privilege to cure.  *Compare and contrast Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor") (internal quotation marks omitted); *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

[28] *Compare and contrast In re Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 898-99 (7th Cir. 2002); *In re Scott*, 172 F.3d 959, 970 (7th Cir. 1999);  *In re Juzwiak*, 89 F.3d 424, 428-29 (7th Cir. 1996); *In re Wickard*, 455 B.R. 628, 632 and 634 (Bankr. W.D. Mich. 2011);  *In re Frommann*, 153 B.R. 113, 117-18 (Bankr. E.D.N.Y. 1993).

[29] "Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statements or explanations made by the bankrupt."  *In re Underhill*, 82 F.2d 258, 260 (2d Cir.), *cert. denied*, 299 U.S. 546 (1936); this language is quoted *in Meridian Bank*, 958 F.2d at 1232 n.3.  *See also In re Juzwiak*, 89 F.3d  at 428-29 ("Oral testimony is not a valid substitute or supplement for written records"); *In re Luby*, 438 B.R. 817, 831-32 (Bankr. E.D. Pa. 2010) (debtors' oral testimony was not a substitute for recordkeeping, where debtors were sophisticated businesspersons, and the trustee was

The debtor's accountant stands behind his post-petition work as *now* presenting an accurate portrayal of the relevant Boyajian finances.  Weir Aff. II ¶ 6.  That assurance might well have supported a rebuttal to summary judgment in favor of the trustee *if the privilege to cure had been granted to Boyajian*.  However, under the circumstances of this proceeding – and, for the sake of argument bypassing the now-concluded issue of privilege to cure – Boyajian has by no means presented a conclusive case for accepting *at this stage of the proceeding* the § 727(a)(3) adequacy of the long-overdue financial information.  The accountant, while supporting his work as reflecting accuracy ("[t]o the best of my knowledge," Weir Aff. ¶ 6), acknowledges (i) the work can only be submitted as "unaudited," (ii) the latest submission is a late-day reconstruction starting from "generally very poor" (and, in some instances worse) books and records, and (iii) Boyajian was (and apparently had to be) a source of information (though the accountant "did not simply accept the information supplied by Jack Boyajian," Weir Aff. II ¶ 9).  And, while tax returns are important and necessary starting points for a trustee's analysis of a debtor's financial history, they are not adequate "books and records" in and of themselves.  This is so, even when an accountant prepares returns.  *See In re Jacobowitz*, 296 B.R. at 668 and 672-73 (tax returns are not the necessary disclosure in a personal bankruptcy); *In re Goldstein*, 123 B.R. 514, 524-25 (Bankr. E.D. Pa. 1991) ("[C]ase law has indicated that copies of tax returns, even when prepared by an accountant from whatever records the accountant can garner from the taxpayer, are not a significant indici of sufficient recordkeeping"); s*ee also In re Volpe*, 317 B.R. 684, 693 (Bankr. D.S.C. 2003) (three years of unfiled tax returns were not the necessary disclosure because they "were not kept in a contemporary manner for purposes of § 727(a)(3)"); s*ee generally* American Institute of Certified Public Accountants, Inc., *Statements on Standards for Tax Services*, 7-1

---

unable to access the computer files of the business); In *re Michael*, 433 B.R. 214, 225 (Bankr. N.D. Ohio 2010) ("By its terms § 727(a)(3) requires the production of written records").

(New York, N.Y. 2009) (effective January 1, 2010) (*available at*

http://www.aicpa.org/RESEARCH/STANDARDS/TAX/Pages/default.aspx).

In sum, even if the threshold issue of privilege to cure had been decided in the debtor's

favor, adequacy of that cure would have remained at issue. Resolution of that issue, if it were to

reach trial, would have further extended this bankruptcy case – a case which is well overdue for

conclusion. In any event – and however the substance of the late documentary submission is

viewed – cure will not be permitted under the circumstances of this proceeding.

## VI.   WHETHER DEBTOR'S FAILURE TO KEEP OR PRESERVE ADEQUATE RECORDS WAS JUSTIFIED

The debtor's effort at justification for ill-maintained records is as follows:

> The books and records of the entities were left in shambles
> by the Michael Barsa who was the Chief Financial Officer
> of my law firms and a partner or officer of several of the
> entities that I was serving as an officer or responsible party.

[D. Aff. ¶ 21]

The debtor's effort to shift blame and justify his discharge fails for the following reasons:

> • Boyajian, well educated, experienced, and sophisticated
> in business matters, is responsible for any shortcomings of
> the purported CFO;[30]

> • Boyajian's blame-shifting statement is vague, failing to
> identify the entities with which Barsa was involved and the
> periods of his involvement;

> • Boyajian does not (and cannot) disclaim knowledge of

---

[30]*In re Cox*, 41 F.3d 1294, 1297 (9th Cir. 1994) reiterated a six-factor test for determining when reliance on another for bookkeeping is justified; three of those factors are: (i) the debtor's intelligence and education; (ii) his business experience; and (iii) the extent of the debtor's involvement in the business for which books and records were found to be deficient. These factors squarely rebut any effort by Boyajian to slough off his responsibility for recordkeeping. And, of course, he had a clear fiduciary duty to keep the family trust in compliance with law. *See In re Wickard*, 455 B.R. at 632 and 634 (a sophisticated debtor who held an accounting degree, was involved for years in multi-million dollar business transactions, could read financial statements and acknowledged the inaccuracy of many paid-in capital accounts in reflecting his interests, was not justified in relying on the inadequate recordkeeping of his in-house bookkeeper and outside accounting firm for § 727(a)(3) purposes and was denied a discharge).

his failure to file his tax returns, those of his wife, the Boyajian Asset Trust for which he was the sole fiduciary, and other entities where he was "president"; knowing that returns at least as far back as those for 2006 were delinquent, the debtor was in a position to retain an accountant (or a replacement CFO or bookkeeper) to assure adequate recordkeeping; Boyajian describes no such effort at cleaning up the "shambles"; and

• The complexity of operating much of his business and financing through the medium of the family trust – a complexity which amplified the need for careful bookkeeping – was the product of Boyajian's scheme, not that of any "CFO."

## VII.    CONCLUSION

Consider the following hypothetical variation of the timeline generating this proceeding. Suppose on the petition date, the debtor had applied to the court for permission to engage in a program of cure so as to provide adequate recorded financial information.  It is conceded that the petition date conditions of a complex array of relevant entities' books and records is very poor, and in some instances nonexistent.  The debtor proposes, at his own expense, to retain an accountant to reconstruct necessary records and prepare some ninety or so tax returns.  It is a daunting task which is projected to take at least a year and a half.  *And, the accountant will not be retained to start his service for another fourteen months.*  Should a bankruptcy court grant the application?  It is submitted that the determination should be a resounding *denial.*  The actuality of the Boyajian proceeding calls for the same result.

There is no genuine issue of material fact at this stage of this proceeding.  The records

required by 11 U.S.C. § 727(a)(3) were not available on the petition date, a fact acknowledged

by the debtor and his accountant.  Years after the case began, and after unprecedented cure

efforts, the debtor's submission of financial documents will not be considered as "cure" for his

substantial and thoroughly unjustified recordkeeping default.  Summary judgment per §727(a)(3)

is awarded to the trustee.[31]  Discharge is denied the debtor; the court will enter its form of order

for judgment.

Dated:  January 31, 2013

/s/ Morris Stern
MORRIS STERN
United States Bankruptcy Judge

---

[31] No decision is necessary or rendered on the balance of the trustee's causes as moved.  The debtor's cross-motion is denied for the reasons supporting the judgment to be entered in favor of the trustee.